ROBERT S. BREWER, Jr.
United States Attorney
FRED SHEPPARD
SHTIAL THAKKAR
Assistant U.S. Attorneys
California State Bar No. 250781
Illinois State Bar No. 6273151
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: 619 546-8237/8785

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 18CR5260-CAB |
| Plaintiff, | **GOVERNMENT'S CONSOLIDATED RESPONSE AND OPPOSITION TO DEFENDANTS' MOTIONS** |
| v. | |
| SALAM RAZUKI (1),<br>SYLVIA GONZALES (2),<br>and<br>ELIZABETH JUAREZ (3),<br>Defendants. | |

COMES NOW, UNITED STATES OF AMERICA, by and through its counsel Robert S. Brewer, Jr., United States Attorney, and Fred Sheppard and Shital Thakkar, Assistant United States Attorneys, and hereby files its consolidated response and opposition to the defendants' various motions, which is based upon the files and records of this case.

//

//

# I

## FACTUAL BACKGROUND

The facts underlying the current indictment are provided for in the Complaint, filed on November 19, 2018, and summarized below for ease of reference:

In October 2018, Razuki and Gonzales met with a Confidential Human Source (CHS1) requesting CHS1 arrange to kill one of their business associates, N.M. According to Razuki and Gonzales, they had invested in multiple properties and business ventures together and were now involved in a civil dispute over their assets.  Razuki and Gonzales told CHS1 that they wanted CHS1 to "shoot him [N.M.] in the face," "to take him to Mexico and have him whacked," or kill him in some other way.  Razuki and Gonzales provided CHS1 a picture of N.M., which CHS1 provided to the FBI.

On or about November 5, 2018, CHS1 met with Gonzales at The Great Maple in San Diego, CA. During the meeting, Gonzales asked if CHS1 could "get rid of Salam's [Razuki] other little problem, [N.M.], because it looks like they're going to appeal…. I would love for him [N.M.] to go to TJ and get lost. Just leave him over there." Gonzales said the civil dispute between her, Razuki, and N.M. was over $44 million dollars. Gonzales went on to say, "It's no joke, Salam [Razuki] has a lot of money tied up right now, and he's paying attorney fees. You need to get rid of this asshole [N.M.], he's costing me too much money!" Gonzales wanted this to occur before the next court date in their civil suit scheduled on or about November 15, 2018. At a certain point during the conversation, a server was close to their table and Gonzales said, "You don't have to kill him, you don't have to put him off the face of the earth." Despite her words at the time, Gonzales was making a slashing movement across her neck indicating she wanted N.M. to be killed. During the conversation, Gonzales advised that there was no reason to involve Razuki in planning for the kidnapping of N.M. because "I am the one with the balls, any time they [business partners, including Razuki] have a problem, they come

after me … they say Sylvia is like a little … honey badger … they're like send the honey badger after them."

On November or about 8, 2018, CHS1 met with Gonzales at Banbu Sushi Bar and Grill in La Mesa, CA. At the outset of the meeting, Gonzales continued to complain about N.M. and the ongoing civil lawsuit. According to Gonzales, another individual was coming, later identified as Juarez, to talk about how to handle N.M. Gonzales said, "Elizabeth [Juarez] right here, Elizabeth is going to give you a proposition also on that problem. She said all you got to do is get him to Mexico and she'll take care of him over there." CHS1 asked, "She will?" and Gonzales replied, "Yes, that's why she's coming."

Approximately one hour, 20 minutes into Gonzales' and CHS1's meeting at Banbu Sushi Bar and Grill, Juarez joined them. Juarez said that all CHS1 needed to do was to get N.M. down to Mexico and she would take care of the rest. Juarez and Gonzales said a lot of people have it out for N.M. so nothing would come back on Razuki. Gonzales said she wanted to watch and wanted N.M. to know that it had come from them [Gonzales and Razuki], but Juarez cautioned Gonzales shouldn't watch because it would be gruesome and haunt her. Juarez said this "wasn't her first rodeo" and went on to talk about a previous incident involving a female from Vista, CA, who was drugged and kidnapped. CHS1, Gonzales, and Juarez discussed a cost of $2,000 for the job. CHS1 clarified whether Gonzales and Juarez wanted this to happen in the United States or Mexico. Juarez said, "No, I don't want it done here [in the United States]." Gonzales added, "No, let's do it in Mexico because we can't be charged in the US. Let's do it in Mexico in case anything comes back to us." Juarez said, "In Mexico it's easier to make things go away. You pay for your freedom." Gonzales and Juarez said they wanted to "put the turkey up to roast before Thanksgiving." After the meeting, CHS1 positively identified a driver's license photo of ELIZABETH Juarez as the individual that joined them and talked of the kidnapping and murder of N.M. This is the same individual observed by FBI agents as joining the meeting as well. Gonzales advised that Razuki often referred to N.M. as "the

midget" and near the end of the dinner, Juarez handed CHS1 her cellphone to take a picture of Gonzales and Juarez and said, "You can take a picture of us when we were going to get rid of the midget [decided to kidnap and kill N.M.]."

After dinner, CHS1 called Gonzales and confirmed that CHS1 could kidnap and murder N.M. During the call, CHS1 told Gonzales to provide information on N.M., including his address, what car he drives, and other identifying information. Gonzales asked to meet the next day so she could give CHS1 the information requested.

On or about November 9, 2018, Gonzales called CHS1 and asked CHS1 to meet her, Razuki, and Juarez. During the meeting, Razuki, Gonzales, and Juarez, discussed with CHS1 several loans they were trying to secure for their businesses, including cannabis dispensaries, as well as Razuki's frustration with the ongoing civil suit with N.M. At times during the meeting, Razuki went to the other side of the room to work, though CHS1 believes it was close enough to overhear the continued conversation between CHS1, Gonzales, and Juarez.  Gonzales asked CHS1 if CHS1 needed money [for the kidnapping of N.M.] and said she would go get $1,000, but asked if CHS1 wanted the full payment instead. CHS1 indicated that $1,000 fine for the time being and Gonzales went to the Goldn Bloom Dispensary and returned with $1,000 cash. Surveillance agents observed Gonzales walk to the Goldn Bloom Dispensary across the street and return.

After the meeting, CHS1 provided agents with $1000 cash provided by Gonzales as well as an envelope with a piece of paper inside, which had also been provided by Gonzales. The paper had two business addresses for N.M. according to Gonzales in a later meeting.

On or about November 13, 2018, Gonzales contacted CHS1 again via phone and informed CHS1 that Razuki and Gonzales would be with N.M. in court at the Hall of Justice located at 330 West Broadway, San Diego, CA. Gonzales requested CHS1 join them so CHS1 could see N.M. in person. CHS1 declined going into the courtroom, but

agreed to stand outside the building and wait for N.M. to exit. While inside the Hall of Justice, Gonzales took a picture of N.M. with her phone and sent it to CHS1 and then called CHS1 and described what N.M. was wearing at the hearing. Gonzales exited the Hall of Justice and met with CHS1 to further discuss the description of N.M., which was recorded. According to Gonzales, the information on the envelope and back of the paper provided on November 9, 2018, was to assist CHS1 in locating N.M. for the kidnapping and murder in Mexico. Gonzales also stated during the meeting "if they take him now, it's gunna be good." Gonzales went back into the courthouse and provided CHS1 with updates as N.M. was departing the Hall of Justice to ensure CHS1 observed N.M. as he left. Gonzales told CHS1 that N.M. would be exiting the courthouse and that Gonzales, Razuki, Juarez, and their attorney would exit after him. FBI agents observed N.M exit the courthouse after CHS1 had been told this and agents observed Razuki, Gonzales, and Juarez proceeded on foot to the vehicle they arrived in and departed.

On November 15, 2018, CHS1 met with Razuki, which was recorded and surveilled by FBI agents. CHS1 said, "I took care of it." Razuki replied, "So he will take care of it, or it's done?" CHS1 replied, "Done." Razuki quickly changed the subject to discuss other business investments and pending loans. Later in the conversation, CHS1 said, "Well, when I talked to what's her name, she said that she wanted to have proof. Do you want to see it, or are you ok with it?" Razuki replied, "No, I'm ok with it. I don't want to see it." Shortly thereafter, CHS1 requested the remainder of the agreed-upon payment and Razuki directed CHS1 to follow up with Gonzales for payment.

On November 15, 2018, Gonzales was arrested. On November 16, 2018, Juarez and Razuki were arrested.

//

//

//

//

# II

## ARGUMENT

### A. SEVERANCE OF THE DEFENDANTS IS NOT APPROPRIATE

"Generally speaking, defendants jointly charged are to be jointly tried." *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980). This presumption in favor of a joint trial "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens to sacrifice time and money to serve on juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once." *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977). The presumption is most compelling in cases where, as here, a conspiracy is charged. *United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir. 2004).

Factors the Court should consider when inquiring into the prejudicial effect of a joint trial include:

> (1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether Appellants could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Fernandez*, 388 F.3d at 1241. "The most important factors are whether the jury can compartmentalize the evidence against each defendant and the judge's diligence in providing evidentiary instructions to the jury." *United States v. Sullivan*, 522 F.3d 967, 981-82 (9th Cir. 2008); see *Fernandez*, 388 F.3d at 1241 (same); *United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993) (noting that limiting instructions are a "critical factor" in assessing the jury's ability to compartmentalize the evidence). Courts should only grant a severance of properly joined defendants if there is a "serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable

judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 538-539 (1993). Defendants are not entitled to severance merely because they may have a better chance of acquittal if tried separately. *Id*. at 540; see also *United States v. Decoud*, 456 F.3d 996, 1008 (9th Cir. 2006); *United States v. Patterson*, 819 F.2d 1495, 1503 (9th Cir. 1987) (holding that possibility of better chance of acquittal was insufficient for an adequate showing of prejudice, because "[t]here must be clear, manifest, or undue prejudice to justify severance.").

Nor is severance warranted merely because the evidence is stronger against the co-defendants than it is against the defendant seeking severance. *United States v. Vasquez-Velasco*, 15 F.3d 833, 846 (9th Cir. 1994); see also *United States v. Smith*, 893 F.2d 1573, 1581 (9th Cir.1990) ("The possibility that some of the evidence ... 'rubbed off' [on defendant] is insufficient to prove compelling prejudice"). Instead, to overcome the presumption favoring joint trials, a defendant must demonstrate that "joinder [is] so manifestly prejudicial that it outweigh[s] the dominant concern with judicial economy and compel[s] exercise of the court's discretion to sever." *United States v. Kaplan*, 895 F.2d 618, 621 (9th Cir. 1990). No such showing has been by the defendants.

### a.    Codefendants' "Exculpatory" Testimony

Both Gonzales and Juarez allege that a joint trial would deny them the right to have a co-defendant provide exculpatory testimony. Their arguments are unavailing.

Severance is rarely granted based on the need for a co-defendant's testimony, primarily because considerations of judicial economy merit serious attention. *United States v. Hernandez*, 952 F.2d, 1110, 1115 (9th Cir. 1991); *United States v. Hoelker*, 765 F.2d 1422, 1425 (9th Cir. 1985). A defendant seeking such severance must establish that: (1) the defendant would call the co-defendant at a severed trial; (2) the co-defendant would testify; and (3) the testimony would be favorable to the defendant seeking severance. *Hernandez*, 952 F.2d at 1115; see also *United States v. Vigil*, 561 F.2d 1316,

1   1317 (9th Cir. 1977)). The district court must then consider the weight and credibility of

2   the proposed testimony and the economy of severance. *Hernandez*, 952 F.2d at 1115.

3   Gonzales merely glosses over these requirements and fails to identify which

4   defendant would testify on her behalf, much less the exculpatory nature of that testimony.

5   "A party moving for severance based on the need for a codefendant's testimony must

6   show that he or she would call the codefendant to testify, that the codefendant would

7   testify and that the testimony would be favorable to the moving party." *United States v.*

8   *Castro*, 887 F.2d 988, 998 (9th Cir. 1989). The testimony must be "substantially

9   exculpatory," not merely beneficial, see *United States v. Mariscal*, 939 F.2d 884, 886

10  (9th Cir. 1991) (internal quotation marks omitted), and the defendant must establish a

11  "reasonable probability" that the co-defendant will in fact testify at trial. *United States v.*

12  *Kaplan*, 554 F.2d 958, 966-967 (9th Cir. 1977). Gonzales fails to comply with either

13  requirement and this lack of showing is fatal to her argument.

14  Juarez asserts she would call Gonzales to testify to statements made by Juarez after

15  a particular meeting with CHS1 to discuss the plant to kidnap and murder the victim. See

16  Juarez Mtn., Dkt. No. 53-1, pp. 7-8. Even were a severance granted, the proposed

17  testimony is inadmissible self-serving hearsay. *United States v. Ortega*, 203 F.3d 675,

18  682 (9th Cir. 2000) (defendant cannot place own hearsay statements "before the jury

19  without subjecting [herself] to cross-examination"); see also *United States v. Fernandez*,

20  839 F.2d 639, 640 (9th Cir.1988) ("It seems obvious defense counsel wished to place [the

21  defendant's] statement ... before the jury without subjecting [the defendant] to cross-

22  examination, precisely what the hearsay rule forbids."). If Juarez wants the jury to hear

23  what she said after a particular meeting, her avenue for doing so is the same whether

24  regardless if tried together or separately: she must testify herself.

25  **b.    Admission of Co-Defendants' Statements to Law Enforcement**

26  Razuki speculates that admission of statements made by codefendants to law

27  enforcement after their arrest necessitates severance. According to Razuki, such

28

statements would be violative of the Supreme Court's holdings in *Bruton v. United States*, 391 U.S. 123 (1968). However, he provides no concrete example of a problematic statement that will be admitted, much less why such a statement could not be properly redacted. See *United States v. Sherlock*, 962 F.2d 1349, 1361 (9th Cir. 1992) (only statements that expressly reference another defendant implicate *Bruton)*; see also *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Razuki also claims that admission of a codefendant's statement to law enforcement would violate the Supreme Court's holding in *Crawford v. Washington*, 124 S.Ct. 1354 (2004). The Ninth Circuit has held otherwise. See *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001 (9th Cir. 2008) (rejecting defendant's assertion of *Crawford* error where *Bruton* was not implicated and observing that "under *Bruton* and its progeny, 'the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially, expressly, or powerfully implicates the defendant"') (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007)); see also *United States v. Hernandez*, 608 F.2d 741, 748-49 (9th Cir. 1979). This is in line with every other Circuit to address the issue. See, e.g., *United States v. Ramos-Cardenas*, 524 F.3d 600, 609-610 (5th Cir. 2008) ("[W]hile *Crawford* certainly prohibits the introduction of a codefendant's out-of-court testimonial statement against the other defendants in a multiple-defendant trial, it does not signal a departure from the rules governing the admittance of such a statement against the speaker-defendant himself, which continue to be provided by *Bruton*, *Richardson*, and *Gray*"); *United States v. Vasilakos*, 508 F.3d 401, 407-08 (6th Cir. 2007) (relying on *Bruton* in joint trial context); *United States v. Rodriguez-Duran*, 507 F.3d 749, 768-70 (1st Cir. 2007) (recognizing *Crawford* and applying *Bruton* in joint trial context); *United States v. Williams*, 429 F.3d 767, 773 n.2 (8th Cir. 2005) ("We note that *Crawford* did not overrule *Bruton* and its progeny"); *United States v. Lung Fong Chen*, 393 F.3d 139, 150 (2d Cir. 2004) ("The same attenuation of Tu's statements from Chen and Liu's guilt that prevents *Bruton* error also

1  serves to prevent *Crawford* error. Thus, there is no separate *Crawford* problem, and we

2  see no indication that *Crawford* overrules *Richardson* or expands the holding of

3  *Bruton*.")

4  　　　Finally, the Supreme Court has held that "limiting instructions to the jury,

5  explaining how and against whom certain evidence may be considered, can reduce or

6  eliminate any possibility of prejudice arising from joint trial." *Zafiro*, 506 U.S. at 539.

7  Where "the district court uses great diligence in instructing the jury to separate the

8  evidence, severance is unnecessary because the prejudicial effects of the evidence of

9  codefendants are neutralized." *Patterso*n, 819 F.2d at 1503 (9th Cir.1987) (footnote and

10  internal quotation marks omitted). Juries are presumed to follow the court's instructions,

11  see *United States v. Heredia*, 483 F.3d 913, 923 (9th Cir. 2007), and a pattern jury

12  specifically directs that the jury "must decide the case of each defendant on each crime

13  charged against that defendant separately," and the jury's "verdict on any count as to any

14  defendant should not control your verdict on any other count or as to any other

15  defendant." See Ninth Circuit Pattern Jury Instruction, 3.13 (2010). Where "the district

16  court uses great diligence in instructing the jury to separate the evidence, severance is

17  unnecessary because the prejudicial effects of the evidence of codefendants are

18  'neutralized.'" *Patterson*, 819 F.2d at 1503; see *Stinson*, 647 F.3d at 1205 (severance

19  unnecessary when "[t]he district court explicitly instructed the jury that it 'must decide

20  the case for each defendant on each charge against that defendant separately'");

21  *Fernandez*, 388 F.3d at 1243 (specifying that a district court's limiting instructions for

22  the jury to "evaluate each defendant's guilt separately . . . more than sufficient[ly] . . .

23  guard[s] against the possibility of prejudice to the defendants."); see also *Zafiro*, 506 U.S.

24  at 539; *Decoud*, 456 F.3d at 1009.

25  //

26  //

27  //

28

10

**B. COUNT ONE, CHARGING A VIOLATION OF 18 U.S.C. 956, WAS A VALID EXERCISE OF CONGRESSIONAL AUTHORITY OVER EXTERNAL AFFAIRS AND FOREIGN COMMERCE.**

Razuki asserts that 18 U.S.C. § 956, prohibiting conspiring to kidnap, maim, or murder in a foreign country, is unconstitutional because Congress exceeded its authority by passing the statute. According to Razuki, that the statute lacks any connection to commerce and thus Congress exceeded its authority in passing the law.  Razuki is mistaken as the statute at issue represents a valid exercise of Congressional authority over external affairs and foreign commerce.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To succeed, he must establish that "no set of circumstances exists under which the Act would be valid." *Id*. "Due respect for the decisions of coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

The Antiterrorism and Effective Death Penalty Act of 199618 expanded 18 U.S.C. § 956 to cover conspiracies within the United States to kill, kidnap, or maim persons overseas. See Pub. L. 104-132, § 704, 110 Stat. 1214, 1294; see also *United States v. Chhun*, 744 F.3d 1110 (9th Cir. 2014) (rejecting overbroad and vagueness constitutional challenges to 18 U.S.C. § 956).  In doing so, Congress properly exercised its authority over external affairs and foreign commerce.

**a.    Congressional Authority Over External Affairs**

As the Ninth Circuit held in *United States v. King*, 552 F.2d 833 (9th Cir. 1976), Congress can exercise external jurisdiction to the full extent allowed by international law. See *id*. at 850 ("There is no constitutional bar to the extraterritorial application of penal

laws.") (citation omitted). "From the body of international law, the Congress may pick and choose whatever recognized principle of international jurisdiction is necessary to accomplish the purpose sought by the legislation." *Id.* at 851. International law, in turn, recognizes five principles that each allow for the exercise of extraterritorial law: the territorial principle, where acts performed outside its borders produce detrimental effects within its borders; (2) the nationality principle, which focuses on the nationality of the accused; (3) the protective principle, where national interests are harmed; (4) the universal principle, involving offenses against the law of nations; and (5) the passive personality principle, which focuses on the nationality of the victim. See *United States v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994); see also *King*, 552 F.2d at 851.

Based on two of these principles, the nationality and territorial principles, the Ninth Circuit held that Congress had the power to punish the foreign distribution of drugs destined for America because the defendants were United States citizens and their activity was intended to, and did, have adverse effects in the United States. See *id.* at 851–52. The current statute implicates those same principles as well as the passive personality principle given that the victims of such conspiracies, as is the case presently, may be nationals of the United States. Based on any or all of these principles, the statute was a valid exercise of Congressional authority. See *King*, 552 F.2d at 851 ("From the body of international law, the Congress may pick and choose whatever recognized principle of international jurisdiction is necessary to accomplish the purpose sought by the legislation.") (quotation omitted).

### b.   Congressional Foreign Commerce Power

In addition to being a valid exercise of its authority over external affairs, the statute was a valid exercise of Congressional authority over foreign commerce. Razuki claims that since 18 U.S.C. § 956 does not explicitly mention a commerce requirement, the Commerce Clause is not implicated. Razuki is again mistaken.

While Razuki is correct that § 956 does not specifically reference commerce. However, neither does a violation of 18 U.S.C. § 1119, prohibiting the foreign murder of a United States national. Despite the lack of any specific mention of commerce in § 1119, the Honorable Jeffrey T. Miller found that the statute was a proper exercise of Congressional authority over both external affairs and foreign commerce. See *United States v. Brimager*, 123 F. Supp. 3d 1246 (S.D. Cal. 2014). As opposed to its authority over interstate commerce at issue in *United States v. Lopez*, 514 U.S. 549 (1995), Congress has "sweeping" and "plenary" authority over foreign commerce, and only a rational nexus with foreign commerce need exist. See *Brimager,* 123 F. Supp. 3d at 1253-54 (citing *United States v. Clark*, 435 F.3d 1100, 1109-17 (9th Cir. 2006)). In *Clark*, the relationship was the defendant's travel in foreign commerce to pay children for sex, see *id* at 1116; in *Brimager*, it was the defendant and victim's travel in foreign commerce prior to the murder and the prevention of the victim's return to the United States through foreign channels.  See 123 F. Supp. 3d at 1254. Travel in foreign channels wasn't merely incidental to the case at hand, but the goal of the conspiracy itself, which centered on the victim being kidnapped in the United States and forcibly taken to Mexico to be killed. Similar to *Brimager*, the Ninth Circuit's "rational relationship" standard is satisfied by the present prosecution and the foreign commerce clause forms an additional basis for § 956.

**C. DEFENDANTS FAIL IN THEIR BURDEN TO SHOW THAT DISCLOSURE OF THE COOPERATING WITNESSES' IDENTITIES IS WARRANTED, OR THAT ADDITIONAL DISCOVERY SHOULD BE ORDERED.**

**a.     The Requests to Disclose CSH1's Identity Are Baseless**

Razuki (ECF Doc. No. 54-1) and Gonzalez (ECF Doc. No. 55-1) seek an order requiring the United States to disclose the identity of CHS1.  Both Defendants fail to support of their motion.  Razuki states that disclosure should be ordered simply because CHS1 is "the sole percipient witness of the alleged conspiracy" and because CHS1 "is a

1    necessary witness to establish chain of custody for the admission of the evidence at trial."
2    See *Razuki Mtn*. ECF Doc. 54-1 at 8.  Razuki fails to elaborate on either claim with legal
3    or factual support.

4         Gonzalez makes a generalized claim that "the testimony of the informant is vital to
5    the defense" because CHS1 "***may*** have information relevant to the ***issues*** of entrapment,
6    imperfect entrapment, and sentencing entrapment."  See *Gonzalez Mtn*. ECF Doc. 55-1 at
7    10 (emphasis added).  Neither Defendant, however, has specified what the anticipated
8    "vital" "necessary" testimony might be.  As set forth below, the defendants have failed to
9    make a legally sufficient showing to support their request for an order requiring the
10   United States to disclose CSH1's identity at this time.

11        In *Roviaro v. United States*, 353 U.S. 53, 59 (1957), the Supreme Court held that
12   "the public interest in effective law enforcement" requires granting the government a
13   qualified privilege to withhold from disclosure the identity of confidential informants.
14   The privilege extends not only to the name of the informant but also to other information
15   (such as the informant's address) that would "tend to reveal" the informant's identity. See
16   Id. at 60.

17        The rationale for the privilege recognized in *Roviaro* was elaborated upon in
18   *McCray v. Illinois*, 386 U.S. 300, 308 (1967):

19        Whether an informer is motivated by good citizenship, promise of leniency
20        or prospect of pecuniary reward, he will usually condition his cooperation on
          an assurance of anonymity -- to protect himself and his family from harm, to
21        preclude adverse social reactions and to avoid the risk of defamation or
          malicious prosecution actions against him.  The government also has an
22        interest in nondisclosure of its informants.  Law enforcement officers often
23        depend upon professional informers to furnish them with a flow of
          information about criminal activities.  Revelation of the dual role played by
24        such persons ends their usefulness to the government and discourages others
25        from entering into a like relationship.

26   *Id.* at 308-09 (quoting 8 *Wigmore, Evidence* § 2374 (McNaughton rev. 1961)).

27

28
                                              14

Although the Supreme Court has held that the *Roviaro* privilege is not absolute, the Court has indicated that the privilege should give way only when disclosure "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60-61.  Declining to establish any "fixed rule with respect to disclosure" of an informant's identity, the Supreme Court described the determination whether to order disclosure as "one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." Id. at 62.

The Ninth Circuit has articulated three of the factors a court must consider in performing the balancing required by *Roviaro*: (1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure.  *United States v. Gonzalo Beltran*, 915 F.2d 487, 488-89 (9th Cir. 1990); see *United States v. Sai Keung Wong*, 886 F.2d at 255-56 (factors in performing balancing are whether the testimony would be "relevant and helpful" to defendant's case, in terms of the relationship between asserted defenses and likely testimony of informant, and government's interest in protecting safety of informant).

A defendant bears the burden of proving the need for disclosure of an informant's identity.  *United States v. Sanchez*, 908 F.2d 1443, 1451 (9th Cir. 1990); *United States v. Williams*, 898 F.2d 1400, 1402 (9th Cir. 1990); *Sai Keung Wong*, 886 F.2d at 256; *United States v. Johnson*, 886 F.2d 1120, 1122 (9th Cir.), cert. denied, 494 U.S. 1089 (1990).  To carry that burden, a defendant must set forth specific facts establishing that disclosure would materially benefit his case.  See *Johnson*, 886 F.2d at 1122; *United States v. Tham*, 665 F.2d 855, 860 (9th Cir.), cert. denied, 456 U.S. 944 (1982); *United States v. Buras*, 633 F.2d 1356, 1360 (9th Cir. 1980).  A defendant's mere speculation that disclosure of information about an informant will prove helpful to his case is insufficient to require such disclosure.  *Sanchez*, 908 F.2d at 1451; *Williams*, 898 F.2d at 1402; *Sai Keung*

1  *Wong*, 886 F.2d at 256; *Johnson*, 886 F.2d at 1122.  Finally, it is never sufficient to assert

2  simply that the informant knows something about the alleged offense to warrant

3  compelled disclosure of the informant's identity; a defendant must show that such

4  disclosure would be both "relevant and helpful" to his defense, or is essential to a fair

5  determination of the case.  See *Roviaro*, 353 U.S. at 60-61; see also *California v.*

6  *Trombetta*, 467 U.S. 479, 485 (1984) ("The prosecution . . . under some circumstances

7  may be required to disclose the identity of undercover informants who possess evidence

8  **critical** to the defense") (emphasis added); *United States v. Kelly*, 449 F.2d 329, 330 (9th

9  Cir. 1971).  In essence, the defendants face "a heavy burden . . . to establish that the

10  identity of an informant is necessary to [the] defense." *United States v. Skeens,* 145 U.S.

11  App. D.C. 404, 449 F.2d 1066, 1071 (D.C. Cir. 1971)

12      Here, the defendants have made nothing more than a bald assertion that CHS1

13  possesses information "vital" and "necessary" to the defense.   Razuki's assertions fail to

14  identify any possible defense or proffer any facts supporting his claim.   Although

15  Gonzalez claims that CHSI "***may*** have information relevant to the ***issues*** of entrapment,

16  imperfect entrapment, and sentencing entrapment;" (*Gonzalez Mtn*. ECF Doc. 55-1 at 10

17  (emphasis added)) that alone, is not enough.  See e.g., *United States v. Brenneman*, 455

18  F.2d 809, 811 (3d Cir. 1972) (Finding unpersuasive Defendant's "speculation that

19  testimony or information from the informant might have been used to impeach or cross-

20  examine [a witness] and 'might even have led to the [defendant's] being able to raise the

21  issue of entrapment.'"); *United States v. Sulia*, 1986 U.S. Dist. LEXIS 21954, at *6

22  (S.D.N.Y. Aug. 1, 1986) ("Defendants claim that the mere possibility of a defense based

23  upon entrapment requires the disclosure of the identity of a confidential informant. The

24  Court does not agree. [citations omitted].  Rather, defendants must make some showing

25  that absent such disclosure they will be denied a fair trial."); *United States v. Ramirez*, 54

26  F. Supp. 2d 25, 32 n.5 (D.D.C. 1999) (rejecting a defendant's argument about needing the

27  identity of the informant to develop "any entrapment defense" as "speculative."); *United*

28

16

*States v. Bauvais*, 1997 U.S. Dist. LEXIS 24859, at \*9 (S.D. Fla. Nov. 29, 1997) (". . . where the asserted defense is entrapment, a court need not order the government to disclose the identity of the informant or permit access for purposes of interviewing and obtaining possible testimony until the defendant presents *some evidence* of entrapment.") Gonzalez also fails to explain why she still cannot explore entrapment "issues" based on the discovery that has been provided, which includes [but is not limited to] recordings and reports related to meetings CHS1 had with the defendants.  In sum, both Razuki and Gonzalez have failed to meet their burden of overcoming the United States interest in not disclosing the identities of CHSI.

### b.  The United States Does Not Yet Need to Disclose Whether CHSI Will Testify in Its Case-in-Chief

Courts have repeatedly clarified that *Roviaro* delineates only the government's obligations to disclose, or authority to withhold, the identity of those informants it does *not* intend to call at trial, and the defendant has no entitlement under *Roviaro* to pretrial disclosure of witnesses who will actually testify on behalf of the prosecution. *See United States v. Perkins*, 994 F.2d 1184, 1190-91 (6th Cir. 1993); *United States v. Foster*, 815 F.2d 1200, 1202-03 (8th Cir. 1987); *United States v. Pennick*, 500 F.2d 184, 186-87 (10th Cir. 1974); *cf. United States v. Cooper*, 91 F.Supp.2d 79, 86 (D.D.C. 2000) (finding, "the government states it intends to call the cooperating witnesses at trial and thus, the government correctly notes the defendant is not entitled to their identities until the government provides its witness list").

However, it is well established that defendants do not have a general right to pretrial disclosure of the identity of government witnesses in non-capital criminal cases. See, e.g., *United States v. Lewis*, 594 F.3d 1270, 1280 (10th Cir. 2010); *United States v. Grace*, 526 F.3d 499, 508-13 (9th Cir. 2008) (*en banc*); *United States v. DeCoteau*, 186 F.3d 1008, 1009 n.2 (8th Cir. 1999); *United States v. White*, 116 F.3d 903, 918 (D.C. Cir. 1997); *United States v. Edwards*, 47 F.3d 841, 843 (7th Cir. 1995); *United States v.*

17

1 | *Perkins*, 994 F.2d 1184, 1190 (6th Cir. 1993); *United States v. Bajasa*, 904 F.2d 137, 139
2 | (2d Cir. 1990); United States v. Massell, 823 F.2d 1503, 1509 (11th Cir. 1987); *United*
3 | *States v. Reis*, 788 F.2d 54, 58 (1st Cir. 1986); *United States v. Higgs*, 713 F.2d 39, 44 n.6
4 | (3d Cir. 1983); *United States v. Jordan*, 466 F.2d 99, 101 (4th Cir. 1972); *United States v.*
5 | *Hancock*, 441 F.2d 1285, 1886-87 (5th Cir. 1971)  Moreover, in 1975, Congress rejected
6 | a proposed amendment to Rule 16 that would have required the government and the
7 | defendant to exchange their witness lists three days before trial.  The conference
8 | committee concluded as follows:

> [I]t is not in the interest of the effective administration of criminal justice to
> require that the government or the defendant be forced to reveal the names
> and addresses of its witnesses before trial. Discouragement of witnesses and
> improper contacts directed at influencing their testimony, were deemed
> paramount concerns in the formulation of this policy.

*H.R. Conf. Rep.* No. 94-414, 94th Cong., 1st Sess., reprinted in 1975 *U.S. Code Cong. &*
*Admin. News* 674, 716.  Certainly, the United States will comply with any deadlines the
Court imposes for revealing its witness list.  At this stage, however, disclosure of that
information is not required, and would be unreasonable.

### c. Defendants' Requests for Supplemental Discovery About the CHS' Are Either Moot or Baseless

Defendants Razuki and Juarez make several requests for discovery regarding the
informants.[1] See *Razuki Mtn.* ECF Doc. 54-1 at 8-11; *Juarez Mtn.* ECF Doc. 53-1 at 6-7.
The United States recognizes and acknowledges its obligation pursuant to *Brady v.*
*Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), Jencks and
Rules 12 and 16 of the Federal Rules of Criminal Procedure.  To date, the United States
has complied with its obligations, and will continue to do so.

---

[1]      Gonzalez makes a request for the disclosure of CHS1's identity, which the United
States has responded to above.  However, tied to that request, Gonzalez also requests the
"location" of CHS1. See *Gonzalez Mtn.* ECF Doc. 54-1 at 11.  The United States adopts
its argument from its first responsive pleading regarding discovery.   See *Govt. Discovery*
*Resp.* ECF Doc. 46 at 7-8.

Juarez's requests relate to "Marco."  Juarez seems to have much more information about Marco than the United States. For example, the United States is not aware of the relevance of many of the phone numbers identified in her motion used by "Marco." Furthermore, all discoverable information as it relates to Marco has been produced.

Gonzalez' supplemental discovery requests seem to relate to CHS1.  The items requested by Gonzalez fall into three categories: (1) the items requested have been produced; (2) will be produced; or (3) need not be produced because there is no legal basis to do so.

Razuki makes several requests that are identical to her first discovery motion.  To date, the United States has complied with all its obligations and will continue to do so. The United States has not only provided reports as it relates to CHS1's participation in this investigation, but also potential impeachment information as it relates to any motive, bias, or interest CHS1 may have, as well as any information which may affect his/her credibility.

Razuki also requests "prior criminal record including information about criminal activity which has not been the subject of arrests, charges, or convictions, such as information about assets acquired through criminal activity."  *Razuki Mtn*. ECF Doc. 54-1 at 8-9.  The United States has produced and will continue to produce all potentially impeachable information as it relates to CHS1. As to criminal activity, any uncharged prior misconduct attributable to government witnesses, all promises made to and consideration given to witnesses by the United States, and all threats of prosecution made to witnesses by the United States will be disclosed in accordance with the mandates of *Brady* and *Giglio*.

Finally, Razuki makes broad, vague requests that do not implicate any obligation upon the United States.  Specifically, Razuki requests that this Court order the United States to disclose "all known occasions on which the informant has made false statements to **any person**, including, **but not limited to**, law enforcement officers or any law

1    enforcement agency or court." *Razuki Mtn*. ECF Doc. 54-1 at 10 (emphasis added).  This

2    request has no basis within the law and goes beyond what is required under *Brady* and

3    *Giglio*.  Any request beyond *Brady* and *Giglio* requirements [as they relate to potential

4    impeachment] should be denied.   Razuki also asks for "[a]ny false identification

5    document which has **ever** been in the possession of and/or used by the informant, and

6    ***each and every occasion on which the informant is known to have used the document***."

7    *Id.* (emphasis added).  This request is overbroad, vague, confusing, and [again] has no

8    legal basis.

9          Finally, Razuki also requests "a list of all cases the informant has worked on in

10   addition to the present case and a list of all cases in which the informant has testified"

11   while at the same time recognizing that "such a list was not required in *United States v.*

12   *Abonce-Barrera*, 257 F.3d 959 (9th Cir. 2001), see id. [sic]at 969."  The United States

13   wholeheartedly agrees that such a list is not required—nor should it be.  All of the

14   defendant's requests, where opposed, should be denied.

15   **D. THE   UNITED   STATES   WILL   COMPLY   WITH   ITS   DISCOVERY**

16   **OBLIGATIONS AND MAKE EVIDENCE AVAILABLE FOR INSPECTION.**

17         As provided in its discovery response, the United States will comply with its

18   discovery obligations under the Jenks Act, 18 U.S.C. § 3500. In doing so, the United

19   States anticipates providing any discoverable grand transcripts prior to trial.

20         Additionally, the United States will make available any physical evidence for

21   inspection by the defendants.  This includes a surveillance hard drive from the Goldn

22   Bloom Dispensary.  Because of the volume of data on the hard drive, approximately 40

23   terabytes, counsel may review the video at the FBI Headquarters and provide a hard drive

24   for downloading any specific time periods they wish.

25   //

26   //

27   //

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E. STATEMENTS BY GONZALES DURING HER TRANSPORT WERE SPONTANEOUS AND VOLUNTARY AND THUS ADMISSBILE.**

Gonzalez was arrested at approximately 7:00 p.m. on November 15, 2018, and subsequently interviewed by FBI agents. Prior to questioning, Gonzales was advised of her *Miranda* rights, acknowledged she understood those rights, and agreed to speak with the agents. The interview, which was recorded and occurred in the agents' vehicle, stopped after Gonzales said she was done talking after seeing an animal control officer taking her dog.

After her interview, Gonzales was transported to the Las Colinas Detention Facility until she could be transported to the Metropolitan Correctional Center (MCC) the following morning.  The following morning, Gonzales was transported to the MCC, but was rejected for having used Xanax and other pills on a daily basis.  At that time, Gonzles was transported to Alvarado Parkway Institute (API) for detoxification. During her transport to the MCC and then to API, Gonzales made several spontaneous statements to the FBI agents transporting her.

For the protections of *Miranda* to apply, a defendant's statements must be the product of custodial interrogation. *Miranda*, 384 U.S. 436, 444 (1966). Where either factor, custody or interrogation, is absent, *Miranda* is not implicated. *Id*. Thus, where a statement did not result from interrogation, there can be no *Miranda* violation. See, e.g., *Jenkins v. Anderson*, 447 U.S. 231,243-44, 100 S. Ct. 2124, 2132 (1980) ("When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment") (Stevens, J., concurring). The *Miranda* Court itself recognized limitations on the scope of the protections set forth in *Miranda*: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478.

21

1   Here, the United States does not dispute that Gonzales was in custody at the time
2   she made the statement. The sole issue, therefore, is whether Gonzales made the
3   statement while under interrogation.

4   In *Rhode Island v. Innis*, the Supreme Court defined interrogation as "express
5   questioning" or "any words or actions on the part of police (other than those normally
6   attendant to arrest and custody) that the police should know are reasonably likely to elicit
7   an incriminating response from the suspect." 446 U.S. 291, 301 (1980).  The statements
8   challenged by Gonzales occurred during her transport and were spontaneous and not the
9   product of interrogation by the agents. Despite this, Gonzales claims that the statements
10  were not voluntary because she had taken Xanax on a daily basis and needed to be
11  transported to API after her arrest and interview by FBI agents the prior night, during
12  which she was advised of the charges against her. The argument is meritless.

13  "In evaluating voluntariness, the 'test is whether, considering the totality of the
14  circumstances, the government obtained the statement by physical or psychological
15  coercion or by improper inducement so that the suspect's will was overborne." *United*
16  *States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002) (quoting *Derrick v.*
17  *Peterson*, 924 F.3d 813, 817 (9th Cir. 1991)). Factors to be considered in this analysis
18  include "the degree of police coercion; the length, location, and continuity of the
19  interrogation; and the defendant's maturity, education, physical condition, mental health,
20  and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) (citing *Withrow v.*
21  *Williams*, 507 U.S. 680, 693-94 (1993). However, "coercive police activity is a necessary
22  predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479
23  U.S. 157, 167 (1986). In addition to a lack of any coercive action by the FBI agents
24  transporting Gonzales, the factors outlined in *Brown* weigh in favor of finding her
25  statements both spontaneous and voluntary, and thus admissible.

26  //
27  //
28

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III

### CONCLUSION

For the foregoing reasons, the Government requests that Defendants' various motions be denied.

DATED: August 2, 2019

Respectfully submitted,

ROBERT S. BREWER, Jr.
United States Attorney

*s/ Fred Sheppard*
Fred Sheppard
Assistant U.S. Attorney

*s/ Shital H. Thakkar*
Shital Thakkar
Assistant U.S. Attorney